IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | Civil Action No. 15-186 |
| v. | ) | |
| MILLARD REFRIGERATED SERVICES, LLC | ) | |
| Defendant. | ) | |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and

through the undersigned attorneys, acting at the request of the Administrator of the United States

Environmental Protection Agency (hereafter U.S. EPA or EPA), files this complaint and alleges

as follows:

### NATURE OF THE ACTION

1.        This is a civil action for penalties and injunctive relief brought pursuant to Section

113(b) of the Clean Air Act (Act), 42 U.S.C. § 7413(b); Section 325 of the Emergency

Planning and Community Right-to-Know Act (EPCRA), 42 U.S.C. §11045; and Section

109(c) of the Comprehensive Environmental Response, Compensation and Liability Act

(CERCLA), 42 U.S.C. § 9609(c), against Defendant Millard Refrigerated Services, LLC

(Millard or Defendant) for violations of Sections 112(r)(1) and 112(r)(7) of the Clean Air

Act,  42 U.S.C. § 7412(r)(1) & (r)(7); and violations of the emergency release notification

requirements of Section 103 of CERCLA, 42 U.S.C. § 9603; and Section 304 of EPCRA,

42 U.S.C. § 11004, at the facility located in Theodore, Alabama formerly owned by the

Defendant (the Facility).

1

JURISDICTION AND VENUE

2.        This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §§ 1331, 1345, and 1355; and Section 113(b) of the CAA, 42 U.S.C. § 7413(b);

Section 109(c) of CERCLA, 42 U.S.C. § 9609(c); and Section 325(b)(3) of EPCRA,

42 U.S.C. § 11045(b)(3).

3.        Venue is proper in this District under Section 113(b) of the Clean Air Act,

42 U.S.C. § 7413(b); Section 109(c) of CERCLA, 42 U.S.C. § 9609 (c); Section 325(b)(3)

of EPCRA, 42 U.S.C. § 11045(b)(3); and 28 U.S.C. §§ 1391(b) and (c)  and 1395(a),

because the Defendant does business in, and these claims arose within, this judicial district.

4.        Notice of commencement of this action has been given to the State of Alabama

pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C 7413(b).

PARTIES

5.        Plaintiff is the United States of America, acting at the request of the EPA, an

agency of the United States.

6.        Defendant is a corporation organized under the laws of the State of Georgia, and

is doing business in this judicial district.

7.        Defendant is a "person" within the meaning of Section 302(e) of the CAA,

42 U.S.C. § 7602(e); Section 101(9) of CERCLA, 42 U.S.C. § 9601(9); and Section 329(7)

of EPCRA, 42 U.S.C. § 11047(7).

8.        Defendant was the "operator" of a refrigerated food processing facility in

Theodore, Alabama (the Facility) within the meaning of Section 112(a)(9) of the CAA,

42 U.S.C. § 7412(a)(9) from the time of its construction in 2005 until July 2013 when its

parent company Millard Holdings Inc. closed the refrigerated portion of the Facility.

Millard Holdings Inc. currently uses the Facility as an unrefrigerated warehouse.

## STATUTORY AND REGULATORY FRAMEWORK

**A.     The Clean Air Act**

9.      In 1990, Congress added Section 112(r) to the Clean Air Act, see Pub. L. 101-549

(Nov. 15, 1990), in response to a 1984 catastrophic release of methyl isocyanante in

Bhopal, India that killed more than 3,400 people, caused over 200,000 to suffer injuries,

and caused damage to crops and livestock.  S. Rep. No. 101-228 (Dec. 20, 1989), reprinted

in 1990 U.S.C.C.A.N. 3385, 3519.  The objective of Section 112(r) of the Clean Air Act,

and its implementing regulations, is "to prevent the accidental release and to minimize the

consequences of any such release" of any extremely hazardous substance.  42 U.S.C.

§ 7412(r)(1).

10.     An "extremely hazardous substance" is any chemical which may, as a result of

short-term exposures because of releases to the air, cause death, injury or property damage

due to its toxicity, reactivity, flammability, volatility or corrosivity.  S. Rep. No. 228, 101st

Cong., 1st Sess. 211 (1989).  Extremely hazardous substances include, but are not limited

to, substances listed pursuant to Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3), at

40 C.F.R. § 68.130, and chemicals on the list of extremely hazardous substances published

under Section 302 of the Emergency Planning and Community Right-to-Know Act

(EPCRA), 42 U.S.C. § 11002, at 40 C.F.R. Part 355, Appendices A and B.

11.     Anhydrous ammonia (also known as $NH_3$) is a listed extremely hazardous

substance under Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3) and 40 C.F.R.

§ 68.130.

12.     The term "accidental release" is defined by CAA Section 112(r)(2)(A), 42 U.S.C. § 7412(r)(2)(A), as an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

13.     Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), mandates three distinct general duty of care requirements for owners and operators of stationary sources producing, processing, handling or storing specific hazardous substances, including extremely hazardous substances.  In pertinent part, Section 112(r)(1) provides:

> It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance.  The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as Section 654 of Title 29 [29 U.S.C. § 654] to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

42 U.S.C. § 7412(r)(1) (hereinafter the General Duty Clause).

14.     Section 112(r)(7) of the Act, 42 U.S.C. § 7412(r)(7), provides that the Administrator of the EPA is authorized to promulgate regulations requiring owners or operators of a stationary source at which an extremely hazardous substance is present in more than a threshold amount to, among other things, prepare and implement a risk management plan  to detect and prevent or minimize accidental releases of extremely hazardous substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment.

15.     EPA has promulgated regulations to implement Section 112(r)(7), codified at 40 C.F.R. Part 68 (RMP Regulations), that require owners and operators of stationary sources that have more than a threshold quantity of a regulated substance in a process to develop and implement a risk management program which must be described in a risk management plan submitted to EPA and which includes, among other things, a management system, a hazard assessment, and a prevention program.

16.     Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C), and 40 C.F.R. § 68.3, define a "stationary source" as any buildings, structures, equipment, installations, or substance emitting stationary activities which belong to the same industrial group, are located on one or more contiguous properties, are under the control of the same person, and from which an accidental release may occur.

17.     "Process" is defined in 40 C.F.R. § 68.3 to mean "any activity involving a regulated substance including any use, storage, manufacturing, handling, or on-site movement of such substances, or any combination of these activities."  "Covered Process" means "a process that has a regulated hazardous substance present in more than a threshold quantity as determined under [40 C.F.R.] § 68.115."  40 C.F.R. § 68.3.

18.     The regulations at 40 C.F.R. Part 68 separate the covered processes into three categories, designated as Program 1, Program 2, and Program 3, and set forth specific requirements for owners and operators of stationary sources with processes that fall within the respective programs.

19.     Pursuant to 40 C.F.R. § 68.10(d), a covered process is subject to Program 3 requirements if the process does not meet one or more of the Program 1 eligibility requirements set forth in 40 C.F.R. § 68.10(b), and if either of the following conditions is met: (a) the process is listed in one of the specific North American Industry Classification System codes found at 40 C.F.R. § 68.10(d)(1); or (b) the process is subject to the United States Occupational Safety and Health Administration (OSHA) process safety management standard set forth in 29 C.F.R. § 1910.119.

20.     Pursuant to 40 C.F.R. § 68.12(d) the owner or operator of a stationary source that is subject to Program 3 prevention requirements must undertake certain tasks including, but not limited to: development and implementation of a management system (as provided in 40 C.F.R. § 68.15); the development and implementation of prevention program requirements, which include the compilation of process safety information, written standard operating procedures, training, a mechanical integrity program, management of change procedures, and pre-startup safety review procedures (as provided in 40 C.F.R. §§ 68.65-68.87); and the development and implementation of an emergency response program as provided in 40 C.F.R. §§ 68.90-68.95.

21.     CAA Section 113(b), 42 U.S.C. § 7413(b), as amended by 28 U.S.C. § 2461 and 31 U.S.C. § 3701 and 40 C.F.R. § 19.4, provides that the Administrator of EPA shall, in the case of a person that is the owner or operator of a major stationary source, and may, in the case of any other person, whenever such person violates any requirement or prohibition of Subchapter I of the Act (42 U.S.C. §§ 7401-7515), commence a civil action for injunctive relief and to assess and recover a civil penalty of up to $25,000 per day for each such violation.

6

22.     Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.

§ 2461 (DCIA), as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C.

§ 3701, and pursuant to EPA's Civil Monetary Penalty Inflation Adjustment Rule, 69 Fed.

Reg. 7,121 (Feb. 13, 2004) and 40 C.F.R. Part 19, 73 Fed. Reg. 75,340 (Dec. 11, 2008),

promulgated pursuant to the DCIA, the maximum amount of the civil penalties provided

under Section 113(b) of the Clean Air Act is $32,500 per day for each violation occurring

from March 15, 2004 until January 12, 2009, and $37,500 per day for each violation

occurring after January 12, 2009.

**B. Comprehensive Environmental Response, Compensation, and Liability Act**

23.     Section 103(a) of the Comprehensive Environmental Response, Compensation

and Liability Act (CERCLA) states that "[a]ny person in charge of . . . an . . . onshore

facility shall, as soon as he has knowledge of any release. . . of a hazardous substance in

quantities equal to or greater than those determined pursuant to [section 102 of CERCLA],

immediately notify the National Response Center."  42. U.S.C. § 9603(a).

24.     Section 109(c) of CERCLA provides as follows:

    The President may bring an action in the United States district court for
    the appropriate district to assess and collect a penalty of not more than
    $25,000 per day for each day during which the violation (or failure or
    refusal) continues in the case of . . . (1) A violation of the notice
    requirements of section 9603(a) of this title . . ..  In the case of a second
    or subsequent violation (or failure or refusal), the amount of such penalty
    may be not more than $75,000 for each day during which the violation
    (or failure or refusal) continues.

    42 U.S.C. 9609(c).

25.     Pursuant to Section 109 of CERCLA, 42 U.S.C. § 9609(a) as modified by

28 U.S.C. § 2461 and 31 U.S.C. § 3701 and 40 C.F.R. § 19.4, any person who violates a reporting requirement of Section 103 of CERCLA shall be liable for a civil penalty of up to $32,500 per day for each violation that occurred after March 15, 2004 and through January 12, 2009, and $37,500 per day for each violation that occurred after January 12, 2009.

**C. Emergency Planning and Community Right-to-Know Act**

26.     Section 304 of EPCRA, 42 U.S.C. § 11004, and the regulations set forth at 40 C.F.R. § 355.40 require the owner or operator of a facility at which a hazardous chemical is produced, used, or stored to notify certain government authorities when there is a release equal to or greater than the reportable quantity of any EPCRA extremely hazardous substance or hazardous substances listed under the CERCLA.  Specifically, Section 304(b) of EPCRA requires that the owner and operator immediately notify the State Emergency Response Commission (SERC) of any state likely to be affected by the release and the emergency coordinator for the Local Emergency Planning Committee (LEPC) for any area likely to be affected by the release.  Additionally, Section 304(c) requires the owner/operator to submit to the LEPC and SERC, as soon as practicable, a written emergency follow-up notice updating the information required under Section 304(b).

27.     Pursuant to Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b), and 40 C.F.R. § 19.4, any person who violates a reporting requirement of Section 304 of EPCRA shall be liable for a civil penalty of up to $32,500 per day for each violation that occurred after March 15, 2004 and through January 12, 2009, and $37,500 per day for each violation that occurred after January 12, 2009.

## GENERAL ALLEGATIONS RELATING TO VIOLATIONS
## AT THE MILLARD THEODORE FACILITY

28.     At all relevant times, Defendant owned and operated a refrigerated food processing facility located at 7730 Deer River Road, Theodore, Alabama, 36582 (the Facility).  The Facility size is over 240,000 square feet with 199,000 square feet of refrigeration and freezing space, consisting of five freezers, two blast tunnels and a blast freezer.

29.     At all relevant times, Defendant maintained a refrigeration system at the Facility which utilized anhydrous ammonia ($NH_3$) in an amount in excess of 100,000 pounds.  The Facility was built in 2005, and then the $NH_3$ refrigeration system was expanded in 2006, increasing the amount of $NH_3$ in process by more than 50 percent.

30.     At approximately 8:15 a.m. on April 25, 2007, Defendant experienced an accidental release of $NH_3$ from its ammonia refrigeration system at the Facility (April 2007 Release).  Approximately 110 pounds of $NH_3$ was released.  The release was caused by a weld crack on a piping component known as the suction header located on the roof the Facility.

31.     Defendant reported that the weld cracked as a result of hydraulic shock. Hydraulic shock is an internal pressure stress on a piping system which occurs as a result of a sudden change in liquid velocity.  This occurs when cold liquid meets hot gas, and this can occur when the defrost cycle on the $NH_3$ refrigeration system is interrupted.  Hydraulic shock results in a hammering effect on system piping.

32.     At approximately 7:00 a.m. on January 6, 2010, Defendant investigated an ammonia alarm and found a weld crack on a suction header located on an evaporator (a

9

part of the $NH_3$ refrigeration system) at the Facility (January 2010 Release). This release of approximately 31.05 pounds of $NH_3$ was also caused by hydraulic shock.

33.     Another release occurred on August 23, 2010. Prior to the release, Millard reported that on August 22, 2010, the $NH_3$ refrigeration system at the Facility had been shut-down as a result of a power failure. The plant engineer arrived at the Facility in response to the loss of power. The plant engineer cleared enough system alarms to restart the blast and high temperature systems, but did not take the measures necessary to allow the freezer portion of the Refrigeration Control System (RCS) to be safely restarted. Millard reported that the plant engineer left the Facility without achieving safe operations on all systems. Before leaving the Facility, the plant engineer also overrode the RCS automatic shutdown mode which allowed additional ammonia to build up in the piping ultimately leading to the August 23, 2010 Release.

34.     On the morning of August 23, 2010, sometime before 8:45 a.m., Defendant experienced an accidental release of $NH_3$ from the roof of its Facility. Over 32,000 pounds of $NH_3$ was released through a cracked pipe on the roof of the Facility (August 2010 Release).

35.     None of the released $NH_3$ was contained during the August 2010 release. It flowed through the ambient air traveling southeast towards the mouth of the Theodore Ship Channel and over the Deepwater Horizon Decontamination Staging Area located at the nearby marine facility. Approximately one hundred and fifty-two people were treated for symptoms of ammonia exposure at several hospitals in the Mobile area and four of those people were admitted into intensive care units.

36.     Defendant reported that there were four possible causes of the August 2010 Release: (A) Hydraulic shock to the roof piping as a result of an early termination of the defrost cycle; (B) Design shortcoming in that too many evaporators went into defrost mode simultaneously; (C) Failure of the RCS because of early termination of a defrost cycle; (D) Human factors in terms of operator error in the actions leading up to the failure.

## COUNTS 1 - 36

### SECTION 112(r)(7) OF THE CLEAN AIR ACT

37.     Paragraphs 1-22 and 28-36 are incorporated herein by reference.

38.     Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), requires owners or operators of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a Risk Management Plan to detect and prevent or minimize accidental releases of such substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment. The owner or operator of a stationary source must submit an initial Risk Management Plan by the date on which a regulated substance is first present at the facility above the threshold quantity in a process.  40 C.F.R. § 68.150(b)(3).

39.     The Facility is a stationary source.  "Stationary source" means, in relevant part, "any buildings, structures, equipment, installations or substance emitting stationary activities...from which an accidental release may occur."  Section 112(r)(2)(C), 42 U.S.C. § 7412(r)(2)(C).

40.     Defendant is an owner and operator of the Facility, a stationary source which handles, stores, and uses $NH_3$.

11

41.      NH$_3$ is among the listed hazardous substances in 40 C.F.R. Part 150, with a regulatory threshold amount of 10,000 pounds.

42.      COUNTS 1 – 6 set forth below pertain to the portion of the regulations found at Subpart D- The Program 3 Prevention Program, 40 C.F.R. § 68.65.  Millard's refrigeration process at the Facility is a covered process because a regulated hazardous substance (NH$_3$) is present in more than a threshold quantity (10,000 pounds).  The covered process at the Millard Facility is subject to RMP Program 3 requirements because it is also subject to the OSHA process safety management standards set forth in 29 C.F.R. § 1910.119.  Counts 1-6 pertain to the RMP requirements under 40 C.F.R. § 68.65(a) which require the owner or operator to complete a compilation of written process safety information ("PSI") before conducting any process hazard analysis.

43.      COUNT 1 - Pursuant to 40 C.F.R. § 68.65(c)(1)(i), Defendant was required to compile a block flow diagram or simplified process flow diagram in its PSI compilation.  However, the process flow diagrams in effect at the time of the August 2010 release did not match Millard's then current operation.  The temperature, pressure and mass flow rates of the accumulator vessel and evaporators which had been added at the time of the 2006 Facility expansion were not described in the diagrams at the time of the August 2010 Release in violation of 40 C.F.R. § 68.65(c) (1)(i).

44.      COUNT 2 - Pursuant to 40 C.F.R. § 68.65(c) (1)(iii), Defendant was required to compile in its PSI the maximum intended inventory.  However, in violation of 40 C.F.R. § 68.65(c) (1)(iii), at the time of the August 2010 Release Defendant listed its maximum inventory as 143,000 pounds when receipts dated August 2005, August 2006, and October 2006, showed that Tanner Industries, Inc, pumped 197,480 pounds of ammonia into

Millard's system. Therefore, Defendant's maximum intended inventory exceeded the amount listed in its PSI.

45.    COUNT 3 - Pursuant to 40 C.F.R. § 68.65(c)(1)(iv), Defendant was required to include in its PSI information pertaining to  safe upper and lower limits for temperatures, pressures, flows or compositions.. However, in violation of 40 C.F.R. § 68.65(c) (1)(iv), Defendant's PSI incorrectly listed high stage discharge pressure upper limit as 270 psig when the correct pressure is 210 psig.

46.    COUNT 4 - Pursuant to 40 C.F.R. § 68.65(d)(1)(ii), Defendant's PSI was required to include accurate information pertaining to the equipment in process including complete piping and instrument diagrams (P&IDs).  However, in violation of   40 C.F.R. § 68.65(d) (1)(ii), Defendant's P&IDs in effect at the time of the August 2010 release did not include or reference the instrument control loops and associated diagrams.

47.    COUNT 5 - Pursuant to 40 C.F.R. § 68.65(d) (1)(iv), Defendant was required to include in its PSI a relief system design and design basis. However, in violation of 40 C.F.R. § 68.65(d) (1)(iv), Defendant's PSI in effect at the time of the August 2010 Release did not document the design basis for its relief system.  Specifically, Defendant failed to provide the loads and sizes of the relief system and failed to provide any analysis for how it determined that the inlet and outlet sizes chosen for the relief valves were the appropriate sizes for the system.  Defendant failed to provide American Society of Heating and Refrigeration and Air Conditioning Engineers ("ASHRAE") number 15 standard calculations for its relief valves and headers.

48.    COUNT 6 - Pursuant to 40 C.F.R. § 68.65(d) (1)(viii), Defendant was required to compile in its PSI information on safety systems (e.g. interlocks, detection or suppression

systems). However, in violation of 40 C.F.R. § 68.65(d) (1)(viii), Defendant's PSI in effect at the time of the August 2010 Release included none of that information.

49.     COUNTS 7 – 10 set forth below pertain to the portion of the regulations found at Subpart D- The Program 3 Prevention Program, 40 C.F.R. § 68.67, and requirements that the Defendant conduct periodic process hazard analyses (PHAs) appropriate to the complexity of the process.  Under these regulations, the Defendant was required to identify, evaluate and control the hazards involved in each process at the Facility.

50.     COUNT 7 - Pursuant to 40 C.F.R. § 68.67(a) owners or operators of covered sources subject to Program 3 requirements shall perform a PHA that is appropriate to the complexity of the process and shall identify, evaluate, and control the hazards involved in the process.  Millard's 2007 and 2010 PHAs did not adequately address the control of hydraulic shock. Therefore, in violation of 40 C.F.R. § 68.67(a), Defendant's PHA did not control the hazards involved in the process.

51.     COUNT 8 - 40 C.F.R. § 68.67(c) required Defendant to prepare a process hazard analysis which: (a) addressed the hazards of the process; (b) identified any previous incident which had a likely potential for catastrophic consequences; (c) addressed engineering and administrative controls applicable to the hazards; (d) addressed the consequences of failure of engineering and administrative controls; (e) addressed the siting of the stationary source ; (f) addressed human factors; (g) and provided a qualitative evaluation of the possible safety and health effects of a failure of controls.  Defendant violated 40 C.F.R. § 68.67(c) by failing to identify and evaluate the following, as part of the PHA conducted subsequent to the April 2007 Release:  (1) human factors; (2) hazards of process such as control system failures, failure of piping to maintain its pressure rating,

loss of instrumentation, failure of the solenoid valve, and loss of electricity; and (3) siting of the stationary source next to an active ship wharf.

52.     COUNT 9 - 40 C.F.R. § 68.67(e) requires the owner or operator to establish a system to promptly address the finding and recommendations from the PHA and to assure that the recommendations are resolved in a timely manner and to document the resolution. Defendant failed to assure resolution of the PHA recommendations related to the April 2007 Release, including a recommendation that testing of the $NH_3$ system was needed to safeguard against a unit rupture in violation of 40 C.F.R. § 68.67(e).

53.     COUNT 10 - 40 C.F.R. § 68.67(f) required Defendant, as part of the PHA process, to update and revalidate the initial PHA at least every five (5) years after the completion of the initial process hazard analysis to assure that the process hazard analysis is consistent with the current process.  Defendant's May 2010 PHA five year review did not assure that the PHA was consistent with the current processes.  Specifically, the review did not include any new or updated analysis or changes even though process changes occurred after the April 2007 release and the Defendant had significantly expanded its facility in 2006.  Therefore, Defendant did not assure that the revised PHA was consistent with its current process in violation of 40 C.F.R. § 68.67(f).

54.     COUNTS 11 – 13 set forth below pertain to the portion of the regulations found at Subpart D- The Program 3 Prevention Program, 40 C.F.R. § 68.69, and requirements pertaining to operating procedures at Defendant's facility.

55.     COUNT 11 -   40 C.F.R. § 68.69(a)(1)(vii)  required Defendant to develop and implement operating procedures that provide clear instructions for safely conducting activities involved in each Covered Process consistent with the PSI from each process at

the Facility and shall address startup after an emergency shutdown. At the time of the

August 2010 Release, the operating procedures only required the operator to clear all

alarms and errors  There was no requirement in the operating procedures that the operator

achieve safe operations after clearing the alarms. As a result, the operator did not safely

restart the freezer system.  This resulted in the release of over 32,000 pounds of $NH_3$.

Therefore, Defendant's operating procedures did not provide procedures to achieve safe

operation after an emergency shutdown in violation of 40 C.F.R § 68.69(a)(1)(vii).

56.     COUNT 12 - 40 C.F.R. § 68.69(c) required Defendant to review the operating

procedures as necessary to assure that they reflect current operating practice, and to certify

annually that these operating procedures were current and accurate.  Defendant's 2006

certification was due on November 8, 2006, however Defendant did not certify until

January 16, 2008.  Defendant was 14 months late in certifying procedures. Defendant failed

in violation of 40 C.F.R. § 68.69(c), to certify annually that its operating procedures were

current and/or accurate and had been reviewed as required.  This is a continuing violation

from November 8, 2006, until it was remedied on January 16, 2008.

57.     COUNT 13 - 40 C.F.R. § 68.69(d) required Defendant to develop and implement

safe work practices to provide for the control of hazards during operations.  Defendant

failed, in violation of 40 C.F.R. § 68.69(d) , to implement safe work practices in at least 5

ways - (a) Failed to include specific valve numbers in the operating procedure for the High

Pressure Receiver; (b) Failed to show that it conducted and documented lock-out/tagout

annual inspections for 2006 through 2010; (c) Failed to demonstrate it completed a daily

motor room log verifying inspection activities; (d) Failed to provide compressor "facility

specific" operating parameters; and (e) Failed to provide contractor M&M compressor start-up documents from the vendor for 2005 and 2006.

58.     COUNTS 14 – 15 set forth below pertain to the portion of the regulations found at Subpart D- The Program 3 Prevention Program, 40 C.F.R. § 68.71, and requirements pertaining to training of employees in the operating procedures at Defendant's facility.

59.     COUNT 14 - 40 C.F.R. § 68.71(b) required Defendant to provide refresher training at least every three years to each employee involved in operating a process to assure that the employee understands and adheres to the current operating procedures of the process.  Defendant failed to provide operator refresher training for the plant engineer in 2008 in violation of 40 C.F.R. § 68.71(b).

60.     COUNT 15 - 40 C.F.R. § 68.71(c) required Defendant to ascertain that each employee involved in operating a process has received and understood the training required by this paragraph and to prepare a record which contains the identity of the employee, the date of training, and the means used to verify that the employee understood the training. Of the Defendant's three refrigeration operators, Defendant could not produce training records that two of the three operators had been trained on the safety and health hazards associated with the process. As operators were not trained in the safety and health considerations involved in operating a process, the Defendant violated 40 C.F.R. § 68.71(c). Defendant also could not produce training records for RCS software changes in 2007 and 2010 or any training documents showing the means used to verify that the employee understood the training, in violation of 40 C.F.R. § 68.71(c).

61.     COUNTS 16 –19  set forth below pertain to the portion of the regulations found at Subpart D- The Program 3 Prevention Program, 40 C.F.R. § 68.73, and requirements

pertaining to the mechanical integrity of the specific process equipment used in the Covered Process.

62.     COUNT 16 - 40 C.F.R. § 68.73(b) required Defendant to establish and implement written procedures to maintain the ongoing integrity of process equipment.  Millard failed to establish and implement written procedures for the following process equipment: 1) process RCS interlocks, and 2) "Receiver" and "Low Low Temperature Accumulator," in violation of 40 C.F.R. § 68.73(b).

63.     COUNT 17 - 40 C.F.R. § 68.73(d)(1) required Defendant to perform inspections and tests on process equipment.  Defendant failed in at least 8 ways to perform inspections and tests on process equipment in violation of 40 C.F.R. § 68.73(d)(1). The list of failures are: (a) no 6 month relief valve inspection in July 2010: (b) no evidence that an oil and vibration analysis for the screw processors was performed annually; (c) no evidence that ammonia was tested for purity on a bi-annual basis; (d) no evidence that the shaft alignment was checked on the screw compressors on an annual basis; (e) no evidence of maintenance on the liquid pumps on either a monthly or annual basis; (f) no evidence that monthly evaporator checks took place; (g) no evidence that inspections and tests were conducted on RCS interlocks; (h) no evidence that Defendant performed the required July 2010 annual test on its key switches and kill button, just prior to the August 2010 Release.

64.     COUNT 18 - 40 C.F.R. § 68.73(d)(2) required Defendant to follow recognized and generally accepted good engineering practices for its inspections and testing procedures in order to maintain the mechanical integrity of its process equipment. Defendant failed, in violation of 40 C.F.R. § 68.73(d)(2), in at least four ways to follow recognized and generally accepted good engineering practices:  (a) Failed to show that it

conducted the IIAR Bulletin No. 109 inspections for all pressure vessels to help identify cracked and damaged vessels; (b) Failed to mark/label its piping to meet the ammonia pipe labeling requirements of IIAR's Bulletin No. 14, Guidelines for Identification of Ammonia Refrigeration Piping and Safety Components; (c) Failed to show that it performed the annual test on its emergency ventilation system in July 2010 (just before the August 2010 Release). A testing schedule for the mechanical ventilation systems is required by IIAR 2 - 2008  Section 13.3.12.1; (d) Failed to provide material certification documents (U-1, U-1A, U-2) for all the screw compressor oil filter housings, screw compressor cooler thermosyphon oil coolers, intercoolers, accumulators, and oil pots.

65.     COUNT 19 - 40 C.F.R. § 68.73(f)(2) required Defendant to make appropriate checks and inspections to assure proper equipment installation consistent with design specifications and the manufacturer's instructions.  Defendant failed in 2007 and 2010, in violation of 40 C.F.R. § 68.73(f)(2) to follow its own certification procedures for original system start up by failing to provide pressure tests and vacuum tests for pipe installation as specified by the equipment manufacturers.

66.     COUNTS 20 – 22 set forth below pertain to the portion of the regulations found at Subpart D- The Program 3 Prevention Program, 40 C.F.R. § 68.81, and requirements for investigation of the April 2007 Release, the January 2010 Release and the August 2010 Release, which resulted or could reasonably have resulted in a catastrophic release of a regulated substance.

67.     COUNT 20 - 40 C.F.R. § 68.81(d)(4) required Defendant to prepare a report of each investigation involving any incident which resulted in, or could have resulted in a

19

release, which report was required to include the factors that contributed to the release. Defendant failed, in violation of 40 C.F.R. § 68.81(d)(4), to determine and document all factors that contributed to the April 2007 Release.  Specifically, Defendant failed, in violation of 40 C.F.R. § 68.81(d)(4), to adequately perform and document an engineering/hazard analysis to determine the root cause of the hydraulic shock event.  In particular, Defendant failed, in violation of 40 C.F.R. § 68.81(d)(4), to identify power loss and process re-start as contributing factors.  For the January 2010 release, Defendant failed in violation of 40 C.F.R. § 68.81(d)(4), to perform/conduct any engineering/hazard analysis to determine the root cause of the crack discovered on the suction header.

68.     COUNT 21 - 40 C.F.R. § 68.81(d)(5) required Defendant to prepare a report of each investigation required by 40 C.F.R. § 68.81, which report was required to include recommendations resulting from the investigation.  Defendant failed, in violation of 40 C.F.R. § 68.81(d)(5), to include any recommendations resulting from the April 2007 Release investigation in its report required under 40 C.F.R. § 68.81(d)(5).

69.      COUNT 22 - 40 C.F.R. § 68.81(e) required Defendant to establish a system to promptly address and resolve the report findings and recommendations from the investigation of the April 2007 Release.  Defendant failed, in violation of 40 C.F.R. § 68.81(e), to establish a system to address and resolve the April 2007 Release report findings.

70.     COUNTS 23 – 24 set forth below pertain to the portion of the regulations found at Subpart E- Emergency Response, 40 C.F.R. § 68.95, and Subpart F – Regulated Substances for Accidental Release Prevention, 40 C.F.R. § 68.180.  Under these regulations Defendant

was required to develop and implement an emergency response program for the purpose of protecting human health and the environment.

71.     COUNT 23 - 40 C.F.R. §§ 68.95(a)(1) and 68.180(a)(2) required Defendant to develop an emergency response plan which included specific actions to be taken in response to an accidental release of a regulated substance.  However, in violation of 40 C.F.R. §§ 68.95(a)(1) and 68.180(a)(2), Defendant's evacuation procedures included a statement that "Small ammonia leaks are normal in the operation of the refrigeration system and do not require an evacuation."  Defendant's emergency response plan does not specify that any action should be taken for small leaks.  Defendant's failure to have an emergency response procedure for a small leak is a violation of 40 C.F.R. §§ 68.95(a)(1) and 68.180(a)(2).

72.     COUNT 24 - 40 C.F.R. § 68.95(a)(3) required Defendant to provide training to all of its employees on relevant emergency response procedures.  Defendant failed, in violation of 40 C.F.R. § 68.95(a)(3), to implement training for all employees in relevant emergency response procedures.  Defendant's 24-hour emergency response personnel failed to complete the annual refresher training course in 2009 and 2010 in violation of 40 C.F.R.  § 68.95(a)(3).

73.     COUNT 25 - 40 C.F.R. § 68.95(c) required Defendant to coordinate its emergency response plan with the community emergency response plan.  Defendant failed, in violation of 40 C.F.R. § 68.95(c), to coordinate its emergency response plan (ERP) with the community response plan.  Defendant's ERP did not clearly identify the roles and responsibilities of the Emergency Response Team members, the local HAZMAT team

and/or the Fire Dept. Failure to identify these roles indicated a lack of coordination with the community response plan in violation of 40 C.F.R. § 68.95(c).

74.      COUNTS 26 – 29 set forth below pertain to the portion of the regulations found at Subpart G –Risk Management Plan - 40 C.F.R. §§ 68.165(a)(2); 68.175; 68.180 and 68.190 and set forth the requirements for preparation and submittal of a Risk Management Plan.

75.      COUNT 26 - 40 C.F.R. § 68.165(a)(2)(b) required Defendant to submit in its Risk Management Plan a worst-case release scenario to represent all regulated toxic substances held above the threshold quantity and one worst-case release scenario to represent all regulated flammable substances held above the threshold quantity.  Defendant failed in 6 ways to submit a worst case scenario representative of all regulated toxic substances held above the regulated quantity:  (a) Maximum intended inventory numbers were lower than actual inventory received; (b) Listed release rate was not compliant with RMP Regulations in violation of 40 C.F.R. § 68.165(a)(2)(b)(7); (c) Listed release duration was not compliant with RMP Regulations in violation of 40 C.F.R. § 68.165(a)(2)(b)(8); (d) Listed distance to endpoint was not compliant with RMP Regulations in violation of 40 C.F.R. § 68.165(a)(2)(b)(11); (e) Estimated residential populations and schools within the distance to endpoint were inaccurate as it did not include public and environmental receptors within the distance in violation of 40 C.F.R. § 68.165(a)(2)(b)(12) ; and (f) Passive mitigation was not considered in violation of 40 C.F.R. § 68.165(a)(2)(b)(13).

76.       COUNT 27 - 40 C.F.R. § 68.175 required Defendant to provide specific information as part of its Risk Management Plan that it submits to EPA.  Defendant failed in 6 ways to meet all the Prevention Program 3 requirements in the its Risk Management

Plan Report dated April 23, 1020: (a) No evidence of a PHA Study for the August 1, 2005, PHA in violation of 40 C.F.R. § 68.175(e) which requires the date of completion of the most recent PHA or update; (b) No date listed for the most recent changes that triggered a Management of Change Procedures in violation of 40 C.F.R. §68.175(i); (c) No date listed for the most recent evaluations of contractor M&M safety performance in violation of 40 C.F.R. §68.175(p); (d) No date listed for the most recent investigation of a release in violation of 40 C.F.R. § 68.175(l); (e) Invalid date listed for latest compliance audit in violation of 40 C.F.R. § 68.175( k); (f) Invalid date listed for latest Emergency Response training in violation of 40 C.F.R. §68.175(g).

77.     COUNT 28 - 40 C.F.R. § 68.180(a)(5) required Defendant to provide the date of the most recent review or update of the emergency response plan. Defendant stated its most recent update of the plan was on April 9, 2009, but was unable to provide this plan. Defendant violated 40 C.F.R. § 68.180 by failing to have the date of the most recent plan in its RMP.

78.     COUNT 29 - 40 C.F.R. § 68.190 required Defendant to update its Risk Management Plan within 6 months of a change that requires a revised PHA. Defendant failed to update its Risk Management Plan within 6 months of expanding Defendant's Facility by adding new compressors, evaporators, blast cells, piping and controls at its Facility in 2006.  Defendant failed to update the plan. This failure is a violation of 40 C.F.R. §68.190(b)(5).

79.     COUNT 30 - Subpart A - Management 40 C.F.R. § 68.15(c) – required Defendant to prepare an organization chart or similar document showing the lines of authority

regarding the development, implementation, and integration of the Risk Management Plan. Defendant failed, in violation of 40 C.F.R. § 68.15(c), to define the all of the lines of authority and the supervisory chain in the Risk Management Plan.

80.     COUNT 31 - Subpart D – Program 3 Prevention Program - 40 C.F.R. § 68.75 Management of Change (MOC) required Defendant to establish and implement written procedures to manage changes to process equipment, chemicals and technology. Defendant failed in at least four ways to meet the MOC requirements:  (a) Failed to develop and implement MOC documents for the RCS changes (i.e. limiting the number of evaporators which can go into defrost at one time); (b) Failed to develop and implement MOC documents following the August 2010 Release for a the installation of a pipe elbow at the end of a pipe;  (c) Did not complete a temporary MOC procedure (PHA, Safety and Health Checklist & Pre-Start Up Safety Review (PSSR)) for the defrost test; (d) Failed to conduct a Process Hazard Analysis regarding the effect of the changes to the process design logic or programming of the refrigeration control system and include that analysis in its Management of Change documentation.  Each of these failures is a violation of 40 C.F.R. § 68.75.

81.     COUNT 32 - Subpart D – Program 3 Prevention Program - 40 C.F.R. § 68.77 Pre-Startup Review- required Defendant to conduct pre-start-up safety reviews  for new stationary sources and for modified stationary sources when the modification is significant enough to require a change in the process safety information.  Defendant failed, in violation of 40 C.F.R. § 68.77, to show that it conducted any pre-start-up safety review prior to operating with the modifications it made to its control system following the April 2007 Release and the August 2010 Release.

82.     COUNT 33 - Subpart D – Program 3 Prevention Program - 40 C.F.R. § 68.79(d) - Compliance Audits –   required Defendant to promptly determine and document an appropriate response to each of the findings of the compliance audit and document that the deficiencies have been corrected. The August 4, 2008 audit listed 10 deficiencies which Defendant failed to provide an appropriate response to, in violation of 40 C.F.R. § 68.79(d).

83.     COUNT 34 - Subpart D – Program 3 Prevention Program - 40 C.F.R. § 68.83(b) Employee Participation required Defendant to consult with employees and their representatives on the conduct and development of process hazards analyses ("PHAs") and other elements of process safety management. Defendant failed, in violation of 40 C.F.R. § 68.83(b), to consult with employees on the conduct and development of PHAs.

84.     COUNT 35 - Subpart D – Program 3 Prevention Program - 40 C.F.R. § 68.85- Hot Work Permit—required Defendant to issue a hot work permit for hot work operations conducted on or near a covered process and to document in the permit that the fire prevention and protection standards of 29 C.F.R. § 1910.252(a) have been implemented prior to the beginning of the hot work operations.  Defendant failed, in violation of 40 C.F.R. § 68.85, to issue a hot work permit for hot work operations or to document that the fire prevention and protection requirements had been implemented.

85.     COUNT 36 - Subpart D – Program 3 Prevention Program - 40 C.F.R. § 68.87(b) – Contractors- required the Defendant to evaluate the safety performance and programs of contractors prior to selection of the contractor.  Defendant could not produce the refrigeration contractor safety performance and programs documentation for its two contractors M&M and ASI who worked on the ammonia refrigeration system at the

25

Facility.  Therefore, Defendant failed to provide evidence that, as part of the selection of these contractors, it had evaluated information regarding each contractor's safety performance and programs as required by 40 C.F.R. § 68.87(b).

86.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as amended by 28 U.S.C. § 2461 and 31 U.S.C. § 3701, provides that the Administrator of EPA shall, in the case of a person which is the owner or operator of a major stationary source, and may, in the case of any other person, whenever such person violates any requirement or prohibition of Subchapter I of the Act (42 U.S.C. §§ 7401-7515), commence a civil action for injunctive relief and to assess and recover a civil penalty of up to $27,500 per day for each such violation.

87.     Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvements Act of 1996 (DCIA), 31 U.S.C. § 3701, and pursuant to EPA's Civil Monetary Penalty Inflation Adjustment Rule (Inflation Adjustment Rule), 69 Fed. Reg. 7,121 (Feb. 13, 2004) and 40 C.F.R. Part 19, 73 Fed. Reg. 75,340 (Dec. 11, 2008), promulgated pursuant the DCIA, Defendant is liable for assessment of a civil penalty of up to $32,500 per day for each violation of the RMP Regulations that occurred after March 15, 2004 through January 12, 2009, and up to , and up to $37,500 per day for each violation that occurred after January 12, 2009.

## COUNTS 37, 38, and 39

## SECTION 112(r)(1) OF THE CLEAN AIR ACT

88.      Paragraphs 1-13 and 27-41 are incorporated herein by reference.

89.      COUNT 37 - Defendant failed in its general duty of care to identify hazards

which may result from an accidental release of anhydrous ammonia in that Defendant

failed to: (A) identify and analyze all known risks associated with the hydraulic shock

hazard; (B) assess risks of an $NH_3$ release to the community surrounding the Facility;

(C) analyze the impact of its Facility expansion in January 2006 when the Facility's

ammonia capacity was increased by 50 percent.

90.      COUNT 38(A) - Defendant failed in its general duty to design and maintain a safe

facility in that Defendant failed to address the causes of and risks associated with hydraulic

shock by: (A) designing an $NH_3$ refrigeration system at the Facility to avoid piping failures

caused by hydraulic shock; (B) having redundant systems or layers of protection in place so

that if piping is breached and/or the automatic control shut down system malfunctions there

is an alternate method of containment; (C) having an adequate maintenance program for

the piping and automatic control shut down system; and (D) failing to design a refrigeration

control system to account for the impacts of a power failure.

91.      COUNT 38(B) - Defendant also failed in its general duty to design and maintain a

safe facility in that Defendant failed to address known design flaws that contributed to

hydraulic shock events – Defendant noted in its September 22, 2010 Incident Report

pertaining to the August 2010 Release that the root cause of the failure was a design flaw

involving its RCS or process controls and the defrost cycle.  Millard was aware of its

27

flawed process design at least as of the April 2007 Release which occurred as a result of a power outage and a restart of the system at the wrong stage in the defrost cycle. Yet, Millard did nothing to address the problem until after the same event occurred in August of 2010 (power outage and restart of the system caused a catastrophic release).

92.     COUNT 39 - Defendant failed in its general duty of care to minimize the consequences of the accidental release of anhydrous ammonia which occurred on April 25, 2007 and August 23, 2010, by failing: (A) to design any type of containment system for the NH$_3$ once released, or any sprinkler system to mitigate potential harm; and (B) provide the plant engineer with the training necessary to handle an emergency situation.

93.     The defendant violated the general duty of care under Section 112(r)(1) of the CAA every day it operated its refrigeration system without a means to adequately control occurrences of hydraulic shock or without conducting an adequate hazard identification, or without having adequate measures in place to respond to a catastrophic release.

94.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as amended by 28 U.S.C. § 2461 and 31 U.S.C. § 3701, provides that the Administrator of EPA shall, in the case of a person which is the owner or operator of a major stationary source, and may, in the case of any other person, whenever such person violates any requirement or prohibition of Subchapter I of the Act (42 U.S.C. §§ 7401-7515), commence a civil action for injunctive relief and to assess and recover a civil penalty of up to $27,500 per day for each such violation.

95.     Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.

§ 2461, as amended by the Debt Collection Improvements Act of 1996 (DCIA), 31 U.S.C.

§ 3701, and pursuant to EPA's Civil Monetary Penalty Inflation Adjustment Rule (Inflation

Adjustment Rule), 69 Fed. Reg. 7,121 (Feb. 13, 2004) and 40 C.F.R. Part 19, 73 Fed. Reg.

75,340 (Dec. 11, 2008), promulgated pursuant the DCIA, Defendant is liable for

assessment of a civil penalty of up to $32,500 per day for each violation of the general duty

of care that occurred after March 15, 2004 through January 12, 2009, and up to $37,500 per

day for each violation that occurred after January 12, 2009.

## COUNT 40

### SECTION 103 OF CERCLA

96.     Paragraphs 23-42 are incorporated herein by reference.

97.     Section 102(a) of CERCLA, 42 U.S.C. § 9602(a), required the Administrator of

EPA to publish a list of substances designated as hazardous substances which, when

released into the environment, may present substantial danger to public health or welfare or

the environment and to promulgate regulations establishing the quantity of any hazardous

substance the release of which was required to be reported under Section 103(a) of

CERCLA, 42 U.S.C. § 9603(a).  EPA has published and amended such a list, including the

corresponding reportable quantities (RQ) for those substances.  This list which is codified

at 40 C.F.R. Part 302, was initially published on April 4, 1985 (50 Fed. Reg. 13474) and is

periodically amended.

98.     Section 103 of CERCLA, 42 U.S.C. § 9603(a), and the regulations found at 40

C.F.R. § 302.6, require a person in charge of a facility or vessel to immediately notify the

National Response Center (NRC), as soon as he or she has knowledge of a release of a hazardous substance from such facility or vessel in an amount equal to, or greater than the reportable quantity (RQ).

99.    Defendant was in charge of the facility during the relevant period described below.

100.    $NH_3$ is a listed hazardous substance as that term is defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), with a reportable quantity (RQ) of 100 pounds as specified in   40 C.F.R. § 302.4(a).

101.    The release of $NH_3$ from the Facility on April 25, 2007 was above the reportable quantity of 100 pounds pursuant to 40. C.F.R. § 302.4(a).  Yet, Defendant failed to notify the National Response Center (NRC) for over 20 hours.

102.    COUNT 40. The Defendant violated the notification requirements of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and the applicable CERCLA regulations, 40 C.F.R. § 302.6, by failing to immediately notify the NRC as soon as Defendant had knowledge of the release of ammonia in an amount equal to or greater than its RQ at Respondent's facility.

103.    Section 109(c) of CERCLA provides as follows:

> The President may bring an action in the United States district court for the appropriate district to assess and collect a penalty of not more than $25,000 per day for each day during which the violation (or failure or refusal) continues in the case of . . . (1) A violation of the notice requirements of section 9603(a) of this title . . . . In the case of a second or subsequent violation (or failure or refusal), the amount of such penalty

may be not more than $75,000 for each day during which the violation (or failure or refusal) continues.

42 U.S.C. § 9606(c).

104.     Under the DCIA and the Inflation Adjustment Rule, the $25,000 per day penalty has been increased to $37,500 per day, and the $75,000 per day penalty for subsequent violations has been increased to $107,500 per day under Section 109(c) of CERCLA as of January 2009.

105.     Defendant is liable for a penalty of $37,500 for its failure to timely notify the NRC on April 25, 2007, of releases of hazardous substances above the reportable quantity.

## COUNT 41 - 43

## SECTION 304 OF EPCRA

106.     Paragraphs 23-42 are incorporated herein by reference.

107.     Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), defines "facility" as buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person).

108.     Defendant has a "facility" as that term is defined by Section 329(4) of EPCRA, 42 U.S.C. § 11049(4).

109.     Defendant was the owner or operator of the facility during the relevant period, described below.

31

110.    At all times relevant to this matter, the facility produced, used, or stored a "hazardous chemical" as defined under EPCRA Section 304(a)(3) of 42 U.S.C. § 11004(a)(3).

111.    Ammonia is an "extremely hazardous substance" as that term is defined by Section 329(3) of EPCRA, 42 U.S.C. § 11049(3), with an RQ of 100 pounds, as specified in 40 C.F.R. Part 355, Apps. A & B.

112.    On April 25, 2007, Defendant had a release of ammonia above the RQ at the facility. The release resulted in the potential for exposure to persons beyond the site on which the facility is located.

113.    On August 23, 2010, Defendant had a release of ammonia above the RQ at the facility.  The release resulted in actual exposure to persons beyond the site on which the facility is located.

114.    40 C.F.R. § 355, Subpart C, require the owner or operator of a facility at which hazardous chemicals are produced, used or stored, to immediately notify the State Emergency Response Commission (SERC) and Local Emergency Planning Committee (LEPC) when there has been a release of a CERCLA hazardous substance or an EPCRA extremely hazardous substance in an amount equal to or greater than the RQ.

115.    COUNT 41 - Defendant violated the notifications requirements of Section 304(a) of EPCRA, 42 U.S.C. §11004(a), and the applicable EPCRA regulations of 40 C.F.R § 355, Subpart C, by failing to immediately notify the SERC and LEPC as soon as

Defendant had knowledge of the release of ammonia on April 25, 2007, in an amount equal to or greater than the reportable quantity at Defendant's Facility.

116.    Section 304(c) of EPCRA, 42 U.S.C. §11004(c) and the regulations found at 40 C.F.R. § 355, Subpart C, require the owner or operator of a facility at which hazardous chemicals are produced, used or stored, to provide a written follow-up emergency notice to the SERC and LEPC when there has been a release of a CERCLA hazardous substance or an EPCRA extremely hazardous substance in an amount equal to or greater than the RQ.

117.    COUNT 42 - Defendant violated the notification requirements of Section 304(c) of EPCRA, 42 U.S.C. § 11004(c), by failing to provide a written follow-up emergency notice to the SERC and LEPC when there had been a release of ammonia on April 25, 2007, in an amount equal to or greater than the RQ  at Defendant's Facility.

118.    COUNT 43 – Defendant violated the notification requirements of Section 304(c) of EPCRA, 42 U.S.C. § 11004(c), by failing to provide a written follow-up emergency notice to the SERC and LEPC when there had been a release of ammonia on August 23, 2010, in an amount equal to or greater than the RQ at the Defendant's Facility.

119.    Under the DCIA and the Inflation Adjustment Rule, the $25,000 per day penalty has been increased to $37,500 per day, and the $75,000 per day penalty for subsequent violations has been increased to $107,500 per day under Section 325(b)(3) of EPCRA.

120.    Defendant is liable for a penalty of $37,500 per day for its failure to notify either, the NRC, the SERC or the LEPC, in a timely manner of the April 25, 2007 release of $NH_3$ , and is liable for a penalty of $37,500 per day for its failure to make a written follow-up

33

report in a timely manner to the SERC and LEPC after the April 25, 2007 Release and the

August 23, 2010 Release of $NH_3$.

## RELIEF SOUGHT

WHEREFORE, Plaintiff, the United States, respectfully prays that this Court provide the

following relief:

1.      Order Defendant to pay a civil penalty for each day of each violation of the Clean Air Act

and the applicable regulations, $32,500 per day for each violation that occurred after March 15,

2004 through January 12, 2009, and $37,500 per day for each violation that occurred after

January 12, 2009;

2.       Order Defendant to pay a penalty of $37,500 for its failure to timely notify the NRC on

April 25, 2007, of releases of hazardous substances above the reportable quantity;

3.       Order Defendant to pay a civil penalty of $37,500 per day for its failure to notify either,

the NRC, the SERC or the LEPC, in a timely manner of the April 25, 2007 release of $NH_3$ , and

is liable for a penalty of $37,500 per day for its failure to make a written follow-up report in a

timely manner to the SERC and LEPC after the April 25, 2007 Release and the August 23, 2010

Release of $NH_3$.

4.      Award the United States its costs of this action; and

5.      Grant the United States such further relief as this Court may deem just and proper.

s/ John C. Cruden
John C. Cruden DC Bar Number: 261321
Attorney for Plaintiff
Assistant Attorney General
Environment and Natural Resources Division
United States Department Of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-2701
Fax: (202) 514-0557
E-mail: john.cruden@usdoj.gov


s/Cheryl A. Luke
Cheryl A. Luke VA Bar Number: 26331
Attorney for Plaintiff
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-5466
Fax: (202) 616-2427
E-mail: cheryl.luke@usdoj.gov